UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JAMES VANCALLIS**, | 2:19-CV-13644 |
| Petitioner, | |
| | **ORDER DENYING PETITION** |
| vs. | **FOR WRIT OF HABEAS** |
| | **CORPUS** |
| **RANDEE REWERTS**, | |
| Respondent. | |

James Vancallis ("Petitioner") confined at the Carson City Correctional Facility in Carson City, Michigan, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his *pro se* application, Petitioner challenges his convictions for first-degree premeditated murder, Mich. Comp. Laws § 750.316(1)(a); first-degree felony murder, Mich. Comp. Laws § 750.316(1)(b); kidnapping for purposes of engaging in criminal sexual penetration, Mich. Comp. Laws § 750.349(1)(c); and assault with intent to commit sexual penetration, Mich. Comp. Laws § 750.520g(1).

For the reasons that follow, the petition for writ of habeas corpus is **DENIED**.

## I. Background

Petitioner was convicted of the above offenses following a jury trial in the Macomb County Circuit Court. This Court recites verbatim the

1

relevant facts regarding Petitioner's conviction from the Michigan Court of Appeals' opinion affirming his conviction, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

> The 14–year–old victim, April Millsap (April), was murdered along the Macomb Orchard Trail on July 24, 2014 sometime between 6:30 p.m. and 8:00 p.m. At approximately 5:30 p.m. that day, she left to take her dog, Penny, on a walk. April's mother, Jennifer Millsap, became concerned after April failed to return by 8:00 p.m. because April was usually only gone for about an hour. Several texts and phone calls to April's phone went unanswered. Jennifer contacted April's boyfriend, Austin Albertson. Austin was very worried because April had texted him "I almost got kidnapped, OMFG." Jennifer, Austin, and Austin's friend, Alex, began to look for April.

> The trail was eight feet wide with asphalt. There was a gully or ditch on the one side that was fairly steep—approximately three or four feet down. It goes up again and the surface at that point is flat but covered in very thick brush and a lot of small trees. That is where April's body was found. Her blouse and bra were pulled down about her waist area and her blue shorts and undergarments were pulled down around her ankles. Her feet were bare and there were two white shoes to the north of the body. There were injuries to her neck and chin with pattern marks from footwear. There was some leaf material clutched in April's hand. There was blood on her face and hair. The manner of death was homicide and the cause of death was "blunt head trauma and asphyxia due to neck compression." April's herringbone-pattern injuries were consistent with a shoe tread, indicating that someone had stood on her neck. The medical examiner testified that the attack on April may have lasted over ten minutes.

Police started their investigation by looking at April's family and loved ones. Security video eliminated April's boyfriend Austin and his friend Alex. Given the gravity of the case, several groups were involved, including: The Violent Crimes Task Force, the Homicide Task Force, the Southeastern Michigan Crimes Against Children Group, the Michigan State Police (MSP), the FBI, and the Macomb County Sheriff's Office. Because there was a lot of publicity about the case, a tip line was established to receive tips from the general public. A number of tips came in from people who thought they saw April on the trail with a man who was on a motorcycle. Several eyewitnesses testified at trial, placing April and defendant on the trail together near the time of her death.

The jury was shown an animation created by FBI special agent Matthew Zentz. Zentz used information from April's phone and entered it into Google Earth to re-create the path the phone took just prior to and after April's death. During that time, April's phone placed three calls and sent one text message. The animation included pinpoints for the times of the phone calls and text messages, as well as the location of the body. At 6:28 p.m., the phone texted—"I was almost kidnapped. OMFG." The phone then attempted three calls to 810–882–2469 at 6:31 p.m., 6:32 p.m., and 6:33 p.m. At approximately 6:44 p.m., the phone departed the area where April was found. Whereas the phone had previously traveled an average of approximately 3.8 miles per hour, the phone suddenly traveled at 22 miles per hour.

A police officer observed a motorcycle in a driveway that appeared to match the description of the motorcycle seen on the trail and in a neighbor's security camera footage. The officer eventually made contact with defendant at a home that defendant shared with numerous family members and his girlfriend, Krystal Stadler. Defendant originally told the officer that he left his house around 5:00 p.m. to visit his brother and left his brother's house before dark because he was worried about hitting a deer. He reported that he wore a

black helmet, a Carhartt hoodie, camouflage pants, and K-Swiss tennis shoes. Defendant provided roughly the same information the following day.

There was no physical evidence linking defendant to April's murder. The evidence against him consisted of eyewitnesses who placed defendant with April on the trail just before the murder as well as Krystal's testimony that defendant behaved strangely the night of the murder. Krystal testified that on the day of the murder defendant left the house on his motorcycle around "four thirty, five" to go to his brother Donnie's house to take his brother a "toothbrush thing" and pick up some money. Defendant was wearing a white t-shirt with football logos on it, gray camo pants, his favorite Jordans, and a backpack. He also owned a Carhartt hoodie. Defendant returned around "eight thirty, nine," just before it started to get dark. Krystal woke up to find defendant cleaning his shoes in the middle of the night. This seemed unusual as she had never seen him clean his shoes before. Defendant explained that he was cleaning off some oil. He used hand sanitizer and a sock. Defendant came back to bed and told Krystal that "he messed up and he needed me to stand by his side." His demeanor was "lovey dovey," which indicated to Krystal that "he did something wrong."

Police interviewed Krystal on a number of occasions and she admitted to giving inconsistent statements. Krystal eventually told police about defendant's statement during a third interview. Krystal admitted that the nine years she and defendant were together were not necessarily harmonious. In fact, during that time Krystal had an affair with a 17–year–old and had a child by him. Krystal and defendant had only recently gotten back together in May 2014, just weeks before the murder.

Police officer seized defendant's helmet and a variety of other items for testing. They also seized a password-protected computer from defendant's room that included prior searches

such as, "why would this girl say I'm too old for her and still hit on me?" and "how to get a girl that does not like you to like you." Officers also found images of defendant wearing the Jordans on social media. Because the shoes Krystal described were never found, officers purchased a similar pair and had them analyzed to see whether they matched the tread found on April's body. There was a "limited association" noted.

Defendant did not testify and did not present any witnesses. Instead, defense counsel vigorously and effectively cross-examined the prosecution's witnesses and argued that defendant was not April's killer. The jury disagreed and found defendant guilty of first-degree premeditated murder, first-degree felony murder, kidnapping for purpose of engaging in criminal sexual penetration, and assault with intent to commit criminal sexual penetration. He was sentenced as outlined above.

*People v. VanCallis*, No. 332514, 2018 WL 341433, at *1-3 (Mich. Ct. App. Jan. 9, 2018).

This Court also recites additional facts from the Michigan Court of Appeals' opinion on remand from the Michigan Supreme Court:

Fourteen-year-old April Millsap was murdered on July 24, 2014, along the Macomb Orchard Trail. As our previous opinion indicates, there was no physical evidence tying defendant to April's murder. The evidence consisted of eyewitness testimony that placed defendant with April on the trail in the moments leading up to her murder. Defendant's girlfriend also testified that defendant behaved strangely the night of the murder and that defendant all but confessed to his involvement and later threatened to take her "down with him" if she cooperated with police. The evidence also included computer-generated animation that demonstrated the path and speed April's cellular phone traveled.

5

*People v. VanCallis*, No. 332514, 2018 WL 6422091, at *1 (Mich. Ct. App. Dec. 6, 2018) (On Remand).

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. VanCallis*, No. 332514, 2018 WL 341433 (Mich. Ct. App. Jan. 9, 2018).

The Michigan Supreme Court remanded the case to the Michigan Court of Appeals because it failed to address the claim of ineffective assistance of counsel that Petitioner raised in his Standard 4 *pro se* supplemental brief.[1] *People v. VanCallis*, 503 Mich. 855, 917 N.W.2d 65 (Mich. 2018).

The Michigan Court of Appeals again affirmed the conviction on remand. *People v. VanCallis*, No. 332514, 2018 WL 6422091 (Mich. Ct. App. Dec. 6, 2018) (Stephens, J., dissenting). The Michigan Supreme Court denied leave to appeal. *People v. VanCallis,* 504 Mich. 944, 931 N.W.2d 359 (Mich. 2019).

Petitioner seeks a writ of habeas corpus on the following grounds:

> I. Defendant was denied his right to the constitutionally effective assistance of counsel where his attorney failed to challenge the admissibility of a computer generated animation, failed to object the police chief's vouching for the credibility of eyewitness testimony, failed to offer an eyewitness identification expert where funds had been

---

[1] Standard 4 of Administrative Order 2004-6, 471 Mich. cii (2004), "explicitly provides that a *pro se* brief may be filed within 84 days of the filing of the brief by the appellant's counsel, and may be filed with accompanying motions." *Ware v. Harry,* 636 F. Supp. 2d 574, 594, n. 6 (E.D. Mich. 2008).

granted to retain such and expert, and failed to object to the prosecutor's misconduct during closing argument. US Const, AMS VI, XIV; Const 1963, Art 1, §§ 17, 20.

II. Defendant was denied a fair trial by the admission over objection of gruesome close-up photographs taken during the autopsy.

III. Defendant was denied his right to the constitutional effective assistance of counsel where his attorney failed to offer a private investigator expert and the crime scene interpretation expert where funds had been granted to retain for defendant's defense.

## II.   Standard of Review

28 U.S.C. § 2254(d) provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) ((quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (*per curiam*)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his or her claim "was so lacking in justification that there was an error well understood and comprehended

in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103.

### III. Analysis

### a. Ineffective assistance of counsel.

In his first and third claims, petitioner argues that he was denied the effective assistance of trial counsel.

To show that he or she was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two-prong test. First, the defendant must demonstrate that counsel's performance was so deficient that the attorney did not function as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id*. In other words, the defendant is required to overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689.

Second, the defendant must show that such performance prejudiced his or her defense. *Id*. To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "*Strickland*'s test for prejudice is a demanding one. 'The likelihood of a different result must be

9

substantial, not just conceivable.'" *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011) (quoting *Harrington*, 562 U.S. at 112). The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel to show a reasonable probability that the result of the proceeding would have been different but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

On habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. at 101. Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. at 664). Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner. *Id.* This means that on habeas review of a state court conviction, "[a] state court must be granted a deference and latitude that are not in operation

10

when the case involves review under the *Strickland* standard itself."
*Harrington*, 562 U.S. at 101.

Because of this doubly deferential standard, the Supreme Court has indicated that:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.
>
> *Harrington v. Richter*, 562 U.S. at 105.

In addition, a reviewing court must not merely give defense counsel the benefit of the doubt but must also affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he or she did. *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011).

Petitioner in his first claim initially contends that his trial counsel was ineffective for failing to challenge the admissibility of the computer-generated animation developed from the data on the victim's Sport Tracking fitness application. Petitioner claims that the evidence was inadmissible hearsay, its admission violated his right to confrontation, and the expert who testified to the animation was not subjected to a pre-trial *Daubert* hearing.

The Michigan Court of Appeals laid out the factual background to petitioner's claim:

11

At trial, FBI special agent Matthew Zentz testified that he had been a special agent with the FBI for 16 years. He was a digital forensic examiner who examined computers and cellphones. Zentz was part of the computer analysis response team (CART) for the past 10 years. It took him two years to become certified. He also had annual proficiency tests. When the prosecutor asked that the trial court qualify Zentz as a witness, defense counsel responded "[w]e have no objection. As long as he sticks to the field of digital forensics."

Zentz testified that CART became involved in the case in September 2014 to analyze April's phone. CART used forensic tools to focus on July 24, 2014, sorting the files by date (Tr II, p. 21). Zentz was particularly interested in a screenshot that was taken by the operating system of the phone itself. It was unusual for a user to take that type of screenshot, so CART looked deeper into it. In so doing, Zentz saw another screenshot of what appeared to be an image of a global position satellite (GPS) that was generated by a fitness application (app) that appeared to be running during the time April was killed. The fitness app was used for people to keep track of their workouts, keeping track of location, time, and speed.

Zentz was unable to directly read the data files because they were in the proprietary format of the company that created the app. Zentz discovered that the sports tracker app was developed by a company out of Finland and that CART needed the company's help in reading the files. Zentz sent the encrypted data files to the company and the company sent back a text file containing 3,000 data points for latitude, longitude, date, time and speed. Zentz used that information to create an animation in Google Earth to re-create the phone's path in the time leading up and directly after April's murder. Zentz denied putting in any of his own information. The animation included pinpoints for the three phone calls directly before April's murder, text messages and the location of the body.

12

Zentz and the team then bought an iPhone to test the data files. The team made a copy of the data files and loaded them on the test iPhone along with the fitness app. They loaded the app and then copied the data files from April's phone to put them in the same file location. This second piece of forensic work indicated that the paths were identical and corroborated what the company had provided.

The animation was admitted without objection and played for the jury.

During cross-examination, defense counsel confirmed that the animation was something that Zentz created. Zentz did not personally travel to Finland, nor did he speak to anyone in person. Instead, Zentz spoke with the company's CEO over the phone. Zentz had no knowledge regarding the CEO's technical experience. Zentz did not inquire into the reliability or the validity of the information. The conversation was exclusively about gaining access to the software. Zentz did not ask for any reliability studies or the error rate associated with the data. He acknowledged that this was something created at law enforcement's request and that it was only as good as the data and information provided by the company. If any of that information was wrong, then the animation would be off. Still, Zentz made no inquiries into the reliability or validity of the information.

*People v. VanCallis*, 2018 WL 341433, at *4.

The Michigan Court of Appeals concluded that trial counsel was not ineffective for failing to object to the admission of the computer-generated animation because it was not inadmissible hearsay for two reasons. First, the animation was used as demonstrative evidence as an aid to illustrate Zentz's testimony and thus was not hearsay. *People v. VanCallis*, 2018

13

WL 341433, at *5. The Michigan Court of Appeals further concluded that even if the animation was hearsay, the animation was admissible under M.R.E. 803(6), the business records exception to the hearsay rule. *Id.*

To the extent that petitioner argues that trial counsel was ineffective for failing to object on the ground that the computer animation was hearsay under Michigan law, he is not entitled to relief.

Federal habeas courts "'must defer to a state court's interpretation of its own rules of evidence and procedure' when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (quoting *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)). Because the Michigan Court of Appeals determined that the computer animation was admissible under Michigan law either as demonstrative evidence or under the business records exception to the hearsay rule, this Court must defer to that determination in resolving petitioner's ineffective assistance of counsel claim. *See Brooks v. Anderson*, 292 F. App'x 431, 437-38 (6th Cir. 2008). Because this Court "cannot logically grant the writ based on ineffective assistance of counsel without determining that the state court erred in its interpretation of its own law," this Court is constrained to reject petitioner's claim that counsel was ineffective for failing to object on hearsay grounds to the computer animation. *See Davis v. Straub*, 430 F.3d 281, 291 (6th Cir. 2005).

Petitioner's related claim that counsel was ineffective for failing to object on Confrontation Clause grounds is likewise meritless. The

14

Michigan Court of Appeals determined that even if the animation was considered a hearsay statement, it was admissible under the business records exception to the hearsay rule:

> Jussi Kaasinen of Sports Tracking Technologies, Ltd. authenticated the data compilation when he signed the "Records of Regularly Conducted Business Activity" for purposes of the Uniform Unsworn Foreign Declarations Act, MCL 600.2181. The data that was provided was made by a person with knowledge of the matter, made at or near the time of the occurrence. Sports Tracking Technologies, Inc. made, kept and maintained the data in the ordinary course of regularly conducted business activity. We reject defendant's claim that the animation was testimonial in nature when Zentz, who created the animation from the underlying data, testified at trial.

*People v. VanCallis*, 2018 WL 341433, at *5 (Mich. Ct. App. Jan. 9, 2018).

Out of court statements that are testimonial in nature are barred by the Sixth Amendment Confrontation Clause unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. *See Crawford v. Washington,* 541 U.S. 36 (2004). However, the Confrontation Clause is not implicated, and thus does not need not be considered, when non-testimonial hearsay is at issue. *See Davis v. Washington*, 547 U. S. 813, 823-26 (2006); *see also Desai v. Booker*, 538 F.3d 424, 425-26 (6th Cir. 2008). Testimonial statements do not include remarks made to family members or acquaintances, business

15

records, or statements made in furtherance of a conspiracy. *Crawford*, 541 U.S. at 51-52, 56.

The Michigan Court of Appeals concluded that the computer animation was admissible under the business records exception to the hearsay rule found in M.R.E. 803(6). Because the animation qualified as a business record, it was a non-testimonial statement and its admission did not violate the Confrontation Clause. *See U.S. v. Baker,* 458 F. 3d 513, 519 (6th Cir. 2006). Because the admission of the computer animation did not violate the Confrontation Clause, counsel was not ineffective for failing to object to its admission on this basis. *See e.g. U.S. v. Johnson*, 581 F. 3d 320, 328 (6th Cir. 2009).

Finally, the Michigan Court of Appeals rejected Petitioner's claim that counsel was ineffective for failing to demand a *Daubert*[2] hearing in this case:

> Zentz had an extensive history as a digital forensic examiner. Defense counsel was not ineffective for demanding a *Daubert* hearing for the limited purpose of exploring Zentz's qualifications in creating the animation, especially where counsel vigorously cross-examined Zentz and utilized an expert to critically examine Zentz's findings.

> *People v. VanCallis*, 2018 WL 341433, at *5.

In light of this analysis, Petitioner failed to show that a *Daubert* hearing would have been successful, hence, he failed to show that trial

---

[2] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

counsel was ineffective for failing to move for a *Daubert* hearing. *See Flick v. Warren*, 465 F. App'x 461, 465 (6th Cir. 2012).

Moreover, the Supreme Court has noted that: "[I]n many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Harrington,* 562 U.S. at 111. Counsel's choice to attack the credibility of Zentz's expert testimony and his computer animation through cross-examination, rather than to object to its admissibility, is a valid strategy that defeats Petitioner's claim. *See e.g. Jackson v. McQuiggin,* 553 F. App'x 575, 580-82 (6th Cir. 2014) (trial counsel was not ineffective by opting to forgo defense expert testimony in arson prosecution, when counsel educated herself on principles of arson investigation, consulted with arson expert, conferred with defense attorneys, and elicited concessions from prosecution expert on cross-examination). Petitioner is not entitled to relief on this claim.

Petitioner next argues that counsel was ineffective in failing to object to Armada Police Chief Howard Smith's testimony that eyewitness accounts are credible and correct most of the time.

The Michigan Court of Appeals rejected the claim:
Defendant's appellate brief fails to show the context in which the testimony took place. The prosecutor had been questioning Smith about how the case was investigated. Specifically, Smith testified that a tip line was created and every tip was pursued. The testimony that defendant finds offensive was included in this lengthy exchange:

Q. [by the prosecutor] Were eyewitnesses developed as a result of the investigation?

A. They were.

Q. How did their information come into the task force?

A. Voluntarily. They came in, they identified, you know, in particular three of them had been on the, on the trail the day of the event. One was an eyewitness. Mr. Reschke has already testified. One was an eyewitness to April. Two were eyewitnesses that said that they saw somebody on a blue and white motorcycle. And then there were two other people that saw something in the little clearing by the Liberty Trail that they thought were suspicious. They came forward as well.

Q. You're an officer of many years, we've spent time questioning the jurors during voir dire about eyewitness testimony and their opinion and credibility. In your experience as an officer, the eyewitness testimony that you're receiving here, how do you, *what do you do to verify or do whatever you can to be certain that it has some credibility?*

A. Through my experience, my training, through different detective bureau courses that I took when I was in the detective bureau and that one of the things that you look at with eyewitness testimony is the credibility, the daylight, the time, the frequency. There is some, if there's a weapon involved there's some focus on the weapon, not necessarily on what they're seeing. And the other thing you want to do is you want to take it for what this eyewitness is telling you, if they have a particular focus on a certain thing you accept that and go with that. You then look at and go with corroboration. You know, were there other people that saw the same thing? Can you, can you corroborate what the eyewitness is telling you? And in the most part, the most part the eyewitness is correct the majority of the time.

18

Q. But there are times where there are issues (inaudible)?

A. Absolutely.

Q. It goes both ways.

A. It does.

Q. Do you know, do you sit, I guess as the judge of it, or do you just simply gather all of that information and continue to move the investigation forward?

A. My job is to gather the information, put it all together and provide it. [Emphasis added.]

It is clear that the prosecutor asked Smith about the steps he takes to verify a tip. Smith was not asked to comment on whether eyewitness testimony was correct a majority of the time; instead, this last comment was non-responsive to the question being asked. Just as "an unresponsive, volunteered answer to a proper question is not grounds for the granting of a mistrial," counsel was not ineffective for failing to object to the challenged testimony. Defense counsel also may have reasonably determined that objecting to the testimony would have drawn unnecessary attention to it.

Defense counsel instead pursued the issue during cross-examination:

Q. [by defense counsel] Okay. Now you just indicated in response to Mr. Cataldo's testimony [sic] that most of the time you find eyewitness testimony to be reliable?

A. Through my training and experience, the bulk of eyewitness testimony is credible, yes.

Defense counsel then questioned Smith at length about the discrepancies in the eyewitness testimony in this case.

19

> Defense counsel's failure to object to Smith's testimony did not fall below an objective standard of reasonableness under prevailing professional norms.
>
> *People v. VanCallis*, 2018 WL 341433, at *6-7.

Counsel was not ineffective for failing to object to Chief Smith's testimony because it was non-responsive, volunteered answer to a legitimate question. *Cf Hodge v. Haeberlin*, 579 F.3d 627, 641 (6th Cir. 2009) (counsel not ineffective in the cross-examination of petitioner's ex-wife, where her damaging statements were made in nonresponsive answers to legitimate questions, and counsel's strategic decision not to object was reasonable). Moreover, counsel may very well have made a strategic decision not to object to Chief Smith's testimony, so as to avoid bringing undue attention to the testimony. *See Cobb v. Perini*, 832 F.2d 342, 347-48 (6th Cir. 1987).

Petitioner also argues in his first claim that trial counsel was ineffective for failing to present an expert in the alleged unreliability of eyewitness identification.

As an initial matter, the Petitioner has presented no evidence either to the state courts or to this Court that he has an expert witness in eyewitness identification. A habeas petitioner's claim that trial counsel was ineffective for failing to call an expert witness cannot be based on speculation. *See Keith v. Mitchell*, 455 F. 3d 662, 672 (6th Cir. 2006). Petitioner has not offered, either to the Michigan courts nor to this Court, any evidence that an expert witness would testify and what the content

of this witness' testimony would have been. In the absence of such proof, Petitioner is unable to establish that he was prejudiced by counsel's failure to call an expert witness to testify at trial on the issues surrounding eyewitness identification, so as to support the second prong of an ineffective assistance of counsel claim. *See Clark v. Waller*, 490 F. 3d 551, 557 (6th Cir. 2007).

Additionally, with respect to Petitioner's claim that counsel was ineffective for failing to call an expert on eyewitness identification, "[N]o precedent establishes that defense counsel must call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the Sixth Amendment." *Perkins v. McKee*, 411 F. App'x 822, 833 (6th Cir. 2011); *see also Dorch v. Smith*, 105 F. App'x 650, 653 (6th Cir. 2004) (upholding as reasonable the Michigan Court of Appeals' conclusion that defense counsel's failure to call an expert witness on eyewitness identification counsel did not satisfy *Strickland*, because counsel "presented several witnesses who testified as to [the habeas petitioner's] whereabouts on the weekend of the incident" and cross-examined the eyewitness regarding inconsistencies in his identification of the petitioner).

Moreover, the Michigan Court of Appeals, in rejecting Petitioner's claim, noted that:

> Although the trial court approved funds for such an expert, defense counsel did not present any evidence or witnesses. However, defense counsel did make eyewitness testimony his

21

focus at trial. Counsel also vigorously and effectively cross-examined the eyewitnesses. Our review of the entire record reveals that defense counsel was zealous and successful in this tactic. Eyewitness testimony was clearly the focus for everyone concerned.

*People v. VanCallis*, 2018 WL 341433, at *7.

Petitioner was not denied effective assistance of counsel due to trial counsel's failure to seek the assistance of expert witness on identification, where counsel elicited testimony to discredit the witnesses' identification testimony. *See Greene v. Lafler*, 447 F. Supp. 2d 780, 794-95 (E.D. Mich. 2006).

Petitioner next contends that trial counsel was ineffective for failing to object to various instances of prosecutorial misconduct.

Petitioner first argues that the prosecutor in his closing argument misstated the law concerning the element of premeditation for first-degree murder.

The Michigan Court of Appeals rejected Petitioner's claim, finding that counsel was not ineffective because the prosecutor did not misstate the law regarding the element of premeditation in his closing argument and that the words he used actually mirrored the instruction that the judge gave the jury on the elements of premeditation and deliberation. *People v. VanCallis*, 2018 WL 341433, at *9.

State courts are the final arbiters of state law. *See Bradshaw v. Richey,* 546 U.S. 74, 76 (2005); *Sanford v. Yukins,* 288 F.3d 855, 860 (6th Cir. 2002). This Court must defer to the Michigan Court of Appeals'

determination that the prosecutor's statement was an accurate statement of Michigan law concerning the element of premeditation required for a first-degree murder conviction. *Matthews v. Parker*, 651 F.3d 489, 520 (6th Cir. 2011), *rev'd in part on other grds sub nom Parker v. Matthews*, 567 U.S. 37 (2012). There was no misconduct here because the prosecutor did not misstate Michigan law concerning the premeditation element. *Id.; see also Palmer v. Bagley*, 330 F. App'x 92, 107 (6th Cir. 2009). Furthermore, because the prosecutor did not misstate the law, trial counsel was not ineffective for failing to object to a proper statement concerning Michigan law. *Matthews*, 651 F.3d at 520.

Petitioner next argues that counsel was ineffective for failing to object to the prosecutor's comments that petitioner was dangerous and that extra security was required to guard against his temper. Petitioner specifically points to the prosecutor's statement—"remember we had to remove you before we brought him out and get more security, because it's very difficult to bring somebody accused of murder that close to the jury."

The Michigan Court of Appeals rejected the claim:

However, defendant takes the statement out of context. During closing arguments, the prosecutor noted:

You have a rare opportunity in this case to see something most juries don't get to see, and that is you got to see Mr. VanCallis' volatility. Remember when Bill Buchanan was standing here and they were doing that God awful, supposed test ...? Bill Buchanan is standing here very quiet. He's going,

23

no, you've got to pull that helmet down, you've got to pull that helmet down, no, the helmet's too high up, you've got to pull that helmet down. And there's VanCallis I pulled it down (inaudible)!

Put it in these terms, in front of 12 people, 14 of you now, 12 who will eventually decide his fate, in front of four armed deputies—remember we had to remove you before we brought him out and get more security, because it's very difficult to bring somebody accused of murder that close to the jury. Four armed deputies, two more armed investigatives [sic] behind me, three cameras showing this case to the world, what does he do? He turns around and he yelled at the Judge. So you tell me what chance did April Millsap have as a small, 14 year old girl on an isolated stretch of the Orchard Trail when she rejected his advances and told him no?

The prosecutor did not mention the need for additional security to guard against defendant's volatility; instead, the prosecutor merely explained what happened during trial. He noted that defendant lost his temper, which was telling because defendant was in front of the jury and the room was full of officers. The prosecutor used defendant's behavior to demonstrate that April was defenseless against him. Because there was nothing objectionable about the prosecutor's statement, defense counsel was not ineffective for failing to object.

*People v. VanCallis*, 2018 WL 341433, at *9.

This analysis is correct if the only possible objections to the prosecutor's conduct were that he referred to the Defendant's loss of temper in the presence of the jury and suggested an inference that the victim would have had to face such volatile anger from the defendant. But the prosecutor also drew attention to the number of deputies

needed to provide security to protect the jury from a person accused of murder. Such a statement was not appropriate because it invited the jury to consider the general dangerousness of the defendant rather than the evidence that he had committed the offense charged. Nevertheless, given the context of the statement and overwhelming evidence of Petitioner's guilt, whatever prejudice it might have caused was unlikely to have affected the outcome of the trial. So, while the Court agrees with Petitioner that the prosecutor's remarks were objectionable, Petitioner was not prejudiced by counsel's failure to object.

Petitioner next claims that counsel was ineffective for failing to object to the prosecutor vouching for the witnesses. The Michigan Court of Appeals rejected the claim, finding that none of the prosecutor's remarks amounted to improper vouching:

> Defendant argues that defense counsel was ineffective for failing to object to the prosecutor's vouching for the police investigation and the prosecution's witnesses. "[T]he prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness. *People v. Bahoda*, 448 Mich. 261, 276, 531 N.W.2d 659, 667 (1995). However, "although a prosecutor may not vouch for the credibility of a witness, a prosecutor may argue and make reasonable inferences from the evidence to support a witness's truthfulness." *People v. Cain*, 299 Mich. App. 27, 36, 829 N.W.2d 37 (2012), vacated in part on other grounds 495 Mich. 874, 838 N.W.2d 150 (2013), cert den. —— U.S. ——, 134 S.Ct. 1895, 188 L.Ed.2d 927 (2014).

> Regarding the investigation, the prosecutor's full statement was as follows:

25

I want to debunk a couple of myths about this case. First of all, I guess who does Mr. VanCallis think he is? Like Al Capone or John Gotti or El Chapo, that we did a backwards investigation? That we decided when we found April Millsap's body we're going to simply pin it on him? That for some, I mean Chief Smith has been there for eight and a half years, had never heard of the name James VanCallis, didn't know who he is. We worked backwards? We decided to find a pair of shoes, match those shoes, know that he had a pair of those shoes and then match those shoes to him? Find somebody in the area who owns a motorcycle and say, he, he's got a motorcycle, let's pin it on him? Really? Really? I mean what is all this? 1,000 tips, 1,000 tips! 75 investigators working full-time for weeks to find 1,000 tips. Each tip was looked at. Each tip was investigated. Each tip on here has a conclusion indicating what was done, where it was done and how it was closed out. How about the fact that Armada Village is small, so that they went to every house and every business in Armada Village and asked questions and filled out surveys, getting information? What about a rolling stop or a roadblock where they stopped hundreds and hundreds of people? There may have been tips coming in on James VanCallis at the time, and those were sent to a special unit. But they didn't avoid any other tip, they didn't stop looking. They spent months investigating every possible clue to be certain that there were no mistakes.

There was nothing improper about the prosecutor's statement. It was responsive to defendant's implication that he was essentially framed for April's murder.

Defendant also complains about the prosecutor's claim that Krystal was credible:

One of our other remaining witnesses is Krystal Stadler. I think it would have been real easy for Krystal to come in here and just simply say more than she did. She could have come in here (inaudible) he confessed to me. She could have come in here and said before he got rid of the shoes I saw blood. She could have come in here and said a lot of different things. She didn't. It's not her place. Everybody knows what it's like to be in the situation that she was in, those who have had or have been themselves victims of domestic violence. Krystal Stadler is a victim of domestic violence. His behavior was physically and verbally abusive she told you, and controlling. She exhibits all of the signs of a battered wife. But she is submissive, she's not vengeful. She had no attitude. She didn't come in here yelling and screaming and wanting a pound of flesh. Was she easily confused? Unfortunately she was. But I don't certainly think that she was lying when she fully understood the gravity of everything that was going on.

* * *

She did the best she could. She told you the truth as she remembered it. And this is where your role becomes very important in this case because you are the one that judges the credibility. My Mr. Sheikh coming on and beating her up and making her confused, did that make her less than she was? Or was she just too complacent when I was asking her questions? You have to make the decision. But I would tell you based on what you saw and what she said she was as straightforward as a person that there is.

Nothing in the prosecutor's statement indicates that he asked the jury to believe Krystal because he had some special insight into her credibility. Instead, the prosecutor asked the jury to consider all of the facts and circumstances surrounding her testimony. Because there was nothing objectionable about the prosecutor's statements regarding the police investigation

and the prosecution's witnesses, defense counsel was not ineffective for failing to object.

*People v. VanCallis,* 2018 WL 341433, at \*10-11.

The Michigan Court of Appeals concluded that the prosecutor's comments did not amount to improper vouching, thus, counsel's failure to object to the prosecutor's comments was not ineffective assistance of counsel. *See Tinsley v. Million*, 399 F.3d 796, 808 (6th Cir. 2005).

Petitioner next argues that defense counsel was ineffective for failing to object to the prosecutor arguing facts that were not in evidence. Petitioner alleges that there was no evidence of "cleaning streaks" on Petitioner's helmet, the size of the tires on his bike, or that Krystal had the characteristics of a battered spouse.

Misrepresenting facts in evidence by a prosecutor can amount to substantial error because doing so "may profoundly impress a jury and may have a significant impact on the jury's deliberations." *Washington v. Hofbauer*, 228 F. 3d 689, 700 (6th Cir. 2000) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974)). Likewise, it is improper for a prosecutor during opening or closing arguments to bring to the jury any purported facts which have not been, or will not be, introduced into evidence and which are prejudicial. *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). However, prosecutors must be given leeway to argue reasonable inferences from the evidence. *Id.*

28

The Michigan Court of Appeals rejected petitioner's claim at length, finding that the prosecutor's comments were based on the evidence presented at trial and reasonable inferences from that evidence. *People v. VanCallis*, 2018 WL 341433, at * 11-12.

In the present case, the prosecutor's remarks were not improper because they were based on reasonable inferences from the evidence presented at trial. Counsel was not ineffective for failing to object. *Stermer v. Warren*, 959 F.3d 704, 737-38 (6th Cir. 2020).

Petitioner lastly argues in his first claim that the prosecutor improperly appealed to the sympathy of the jury and their civic duty with the following remark:

> Is there really a question of rape in this case? There's one and only one reason why you would leave a 14 year old girl like this. He has no reason to embarrass her. He has no personal connection with her. To embarrass somebody means to imply that you have an emotional connection. There wasn't any. They were strangers. This case was a random act, which is why the Village of Armada and all of the surrounding areas were scared to their core. Because April Millsap is somebody's daughter. She's Jennifer's daughter, but she could have been anybody's daughter that day on the trail.

The Michigan Court of Appeals rejected the claim:

> The prosecutor's comment was focused on the randomness of the crime and did not ask the jury to convict out of sympathy or civic duty. Moreover, the trial court instructed the jury: "Remember that you have taken an oath to return a true and just verdict based only on the evidence and my instructions on the law. You must not let sympathy or prejudice influence your decision." Because there was nothing objectionable about

the prosecutor's statement, defense counsel was not ineffective for failing to object.

*People v. VanCallis*, 2018 WL 341433, at \*13.

The prosecutor's comment, even if it was an attempt to invoke sympathy with the jury, would not entitle Petitioner to habeas relief because the remark was relatively isolated, was not extensive, and was only a small part of the closing argument that focused on summarizing the evidence. *Byrd*, 209 F. 3d at 532. This portion of Petitioner's claim would also be defeated by the fact that the trial court instructed the jury that they were not to let sympathy or prejudice influence their decision. *See Cockream v. Jones*, 382 Fed. App'x 479, 486 (6th Cir. 2010); *see also Welch v. Burke*, 49 F. Supp. 2d 992, 1006 (E.D. Mich. 1999).

In summary, Petitioner cannot show that counsel was ineffective for failing to object to any of the prosecutor's alleged misconduct, in light of the fact that the Michigan Court of Appeals found on direct appeal that the remarks and questions were not improper. *See Finkes v. Timmerman-Cooper*, 159 F. App'x 604, 611 (6th Cir. 2005); *Campbell v. United States*, 266 F. Supp. 2d 587, 589-90 (E.D. Mich. 2003). Petitioner is not entitled to relief on his first claim.

In his third claim, Petitioner argues that trial counsel was ineffective for failing to offer a private investigator or crime scene expert at trial.

30

A majority of the Michigan Court of Appeals on remand rejected this claim, by noting that Petitioner failed to provide any affidavits or indication as to how the experts would have helped his case. *People v. VanCallis*, 2018 WL 6422091, at *3.

Petitioner has failed to show that counsel would have obtained beneficial information had he presented an investigator at trial as a witness, thus, he failed to establish that he was prejudiced by counsel's failure to call such an investigator or expert to testify. *See Welsh v. Lafler*, 444 F. App'x 844, 851 (6th Cir. 2011) (Defense counsel's failure to hire private investigator during prosecution for criminal sexual conduct did not prejudice defendant, and thus was not ineffective assistance; defendant failed to present sufficiently detailed and convincing account of what additional facts investigator could have discovered in support of defendant's innocence). Petitioner is not entitled to relief on his third claim.

### b. The photograph claim.

Petitioner next claims that he was denied a fair trial when the prosecutor was permitted to introduce photographs of the victim from the autopsy which petitioner claims was "gruesome."

The Michigan Court of Appeals rejected the claim:
After viewing the photos, we are convinced that their sole purpose was not to inflame the jury. Instead, the photographs were relevant to show the extent of April's injuries and identify defendant as the killer through comparable tread patterns. The photographs were also relevant to explain the

absence of physical evidence at the scene. The trial court carefully considered the photos before it determined that they were relevant and not substantially more prejudicial than probative. Its decision did not fall outside the principled range of outcomes.

*People v. VanCallis*, 2018 WL 341433, at \*14.

It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court is limited in federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id.* Thus, errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court. *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000).

Petitioner's claim that the trial court admitted photographs of the murder victim fails to state a claim upon which habeas relief can be granted. *See e.g. Franklin v. Bradshaw,* 695 F.3d 439, 456-57 (6th Cir. 2012) (state court's determination, that petitioner's right to fair trial was not denied by admission of 18 gruesome autopsy photographs of his victims that were shown to jurors on large projector screen during trial for aggravated arson, aggravated robbery, and aggravated murder, was not contrary to clearly established federal law). In particular, the introduction of graphic or gruesome photographs of a murder victim does not entitle a petitioner to habeas relief where there is some legitimate evidentiary purpose for the photographs' admission. *See e.g., Biros v.*

32

*Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (upholding the admission of photographs depicting a victim's severed head, severed breast, and severed body parts placed near the victim's torso; the photos were highly probative of the prosecutor's claim that the petitioner beat the victim severely and meticulously dissected her body); *Frazier v. Huffman*, 343 F.3d 780, 789 (6th Cir. 2003) (finding acceptable the admission of multiple photographs of the victim used by the coroner to illustrate the nature of the encounter preceding the victim's death); *Cooey v. Coyle*, 289 F.3d 882, 893 (6th Cir. 2002) (observing that "although the photographs were gruesome, they were highly probative").

The Michigan Court of Appeals determined that "the photographs were relevant to show the extent of April's injuries and identify defendant as the killer through comparable tread patterns. The photographs were also relevant to explain the absence of physical evidence at the scene." *People v. VanCallis*, 2018 WL 341433, at \*14. Because the photographs served a proper evidentiary purpose, the trial court's decision to admit them did not render Petitioner's trial fundamentally unfair or entitle him to habeas relief. Petitioner is not entitled to habeas relief on his second claim.

### c. Conclusion.

The Court will deny the petition for writ of habeas corpus. The Court will also deny a certificate of appealability to Petitioner. In order to obtain a certificate of appealability, a prisoner must make a

substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254. The Court will deny Petitioner a certificate of appealability because of the reasons stated above and because he has failed to make a substantial showing of the denial of a federal constitutional right.

Although this Court denies a certificate of appealability, the standard for granting an application for leave to proceed *in forma pauperis* (IFP) is lower than the standard for certificates of appealability. *See Foster v. Ludwick*, 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002). While a certificate of appealability may only be granted if petitioner makes a substantial showing of the denial of a constitutional right, a court may grant IFP status if it finds that an appeal is being taken in good faith. *Id.* at 764-65; 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a). "Good faith" requires

34

a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits. *Id.* at 765. Although jurists of reason would not debate this Court's resolution of petitioner's claims, the issues are not frivolous; therefore, an appeal could be taken in good faith and petitioner may proceed *in forma pauperis* on appeal. *Id.*

Based upon the foregoing, **IT IS ORDERED** that the Petition for a Writ of Habeas Corpus is **DENIED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner is **GRANTED** leave to appeal *in forma pauperis*.


/s/Terrence G. Berg
HONORABLE TERRENCE G. BERG
Dated: November 17, 2020    UNITED STATES DISTRICT JUDGE